IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
SEPTEMBER 21, 2004 Session

STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v.
JENNIFER SIMPSON BLACKWELL
IN THE MATTER OF J.S., Jr. (DOB 6/21/96)

Direct Appeal from the Juvenile Court for Henry County
No. 7240     Hansel J. McAdams, Judge

_____

No. W2004-00509-COA-R3-PT - Filed November 8, 2004
_____

This case involves the termination of Mother's parental rights. The trial court found clear and convincing evidence to terminate Mother's parental rights on the grounds of (1) persistent conditions and (2) substantial noncompliance with the permanency plan. Additionally, the trial court determined that termination of Mother's parental rights was in Child's best interest. Mother appeals the decision of the trial court. For the following reasons, we affirm.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Jim L. Fields, Paris, TN, for Appellant

Paul G. Summers, Attorney General & Reporter, Juan G. Villaseñor, Assistant Attorney General, Nashville, TN, for Appellee

## OPINION

## Facts and Procedural History

Jennifer S. Blackwell ("Mother" or "Appellant") is the mother of J.S., Jr. ("Child"), who was born on June 21, 1996.[1] On or about July 6, 2002, Mother and Stephen Blackwell ("Stepfather") picked up Child and his siblings[2] from the house of Royce Bates ("Grandfather"), Child's maternal grandfather, and Linda Bates ("Grandmother"), Child's maternal grandmother.[3] After J.S. and T.B. went to bed, Mother and Stepfather had to force Child to go to sleep because he wanted to stay awake. Subsequently, Child exited Mother's and Stepfather's home through a window and went to Kim Wilson's ("Wilson") home, who was a neighbor of Mother and Stepfather. Child informed Wilson that Stepfather slapped him. Wilson telephoned local law enforcement, and Deputy Timothy Pinson ("Deputy Pinson") of the Henry County Sheriff's Department responded to the call.

Upon arrival, Child informed Deputy Pinson that Stepfather slapped him, and Deputy Pinson noticed a mark which appeared to be a handprint on the side of Child's face. Child explained that he went to Wilson's house for food and had done so for the past two weeks. Subsequently, Deputy Pinson went to the residence of Mother and Stepfather to further investigate the matter. Upon inspection of the home, Deputy Pinson observed that a mattress was against a window with no glass, the rooms were full of trash and various items making it difficult to walk around in the home, and there were many dirty dishes with molded food on them. When questioned about the incident, Stepfather said he could not remember hitting Child in the face but did not deny it. Child was taken to the Henry County Medical Center for an examination.

At trial, Mother and Stepfather denied that Stepfather ever hit Child other than the occasional spanking for disciplinary purposes. Further, Stepfather, Mother, Grandfather and Grandmother testified that the red mark on Child's face on that day was from the tape holding on an eye patch Child was wearing as a result of a recent eye surgery Child underwent.[4] The testimony of Mother, Stepfather, Grandfather, and Grandmother explained that, earlier that day, Child was staying at his grandparents' home and wanted to play in a wading pool. They further testified that, as a result of this water activity, the patch and tape came off Child's face, leaving red marks. The physicians at the Henry County Medical Center could not state for certain that such red marks were caused by a slap to the face.

---

[1] Child's father, J.S., Sr., died as a result of a hunting accident on September 9, 2003, and, therefore, he is not a party to this action.

[2] Child has two siblings: Child's brother, J.S. ("J.S."), and Child's half sister, T.B. ("T.B."), who is Mother's and Stepfather's daughter.

[3] Though DCS petitioned for and had J.S. and T.B. brought into the custody of the lower court, they are not at issue in this action.

[4] The reason Child wore a patch on his left eye on the day in question was because he required surgery on that eye from a self-inflicted wound with a knife, further evidencing that Child has special needs.

Subsequently, Stepfather was charged with aggravated child abuse. Stepfather pled guilty to a lesser charge of reckless endangerment. As a result, Stepfather was sentenced to eleven months and twenty-nine days in the county jail but was granted probation after serving ten days.

Shortly after Child's removal, the Tennessee Department of Children's Services ("DCS") petitioned the Henry County Juvenile Court for temporary custody of Child and his siblings on July 11, 2002. That same day, the lower court brought all three children into the protective custody of the court. Subsequently, Child was placed in the custody of his great uncle and great aunt, Kenneth and Charlene Davis (collectively the "Davis'"). However, because Child is a special needs child who is emotionally disturbed, the Davis' were unable to care for Child for more than a few months, and Child returned to the lower court's protective custody on November 13, 2002. Specifically, Child has been diagnosed with ADHD and bipolar disorder. Additionally, Child acts out sexually towards other children. On December 5, 2002, DCS and Mother entered into a permanency plan, setting goals that Mother and Stepfather would need to meet in order to have Child returned to their custody. On June 11, 2003, Child was placed in the custody of Jo Curtis ("Curtis"), who is a specially trained foster mother with Youth Villages.

During the period of over a year that Mother and Stepfather did not have custody of Child, Mother visited Child sporadically, and, after the two visits in May and July 2003, Child became very disruptive for a period of time and experienced nightmares and depression. However, there was no evidence that anything abnormal or inappropriate occurred at either one of these visits.

Less than a month after Child was removed in July 2002, Mother and Stepfather married on August 3, 2002. Mother currently works at a local fast food restaurant while Stepfather is employed by the Dynamic Plastic Molding Company. Mother recently obtained her legal assistant degree from the Tennessee Technology Center and Stepfather holds an associate's degree in electronics. Mother admitted that Stepfather has abused her in the past, but that he did not hit Child. Additionally, Grandfather testified that Mother and Stepfather had "smacking sessions," but the mark on Child's face was from the surgical tape and Child was known to tell lies in the past.

DCS filed a petition to terminate Mother's parental rights with respect to Child on August 5, 2003, on the grounds of willful abandonment for failing to visit or support, persistent conditions, and substantial noncompliance with the permanency plan. After a hearing on December 1, 2003, the trial court issued an order terminating Mother's parental rights on the grounds of persistent conditions and substantial noncompliance with the permanency plan. Mother appeals to this Court and presents the following issues for our review:

I.   Whether the trial court erred when it determined that there was clear and convincing evidence of the grounds of persistent conditions or substantial noncompliance; and

II.  Whether the trial court erred when it determined that termination of Mother's parental rights was in Child's best interest.

For the following reasons, we affirm the decision of the trial court.

## Standard of Review

The findings of fact by a trial court sitting without a jury are reviewed by this Court *de novo* upon the record with a presumption of correctness, and, unless the evidence preponderates against the findings, we must affirm, absent an error of law. Tenn. R. Civ. P. 13(d); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re L.J.C., A.L.C., & J.R.C.*, 124 S.W.3d 609 (Tenn. Ct. App. 2003). Further, we review issues of law *de novo* with no presumption of correctness. *Valentine*, 79 S.W.3d at 546 (citing *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993)).

## Grounds for Termination

Before a trial court may terminate parental rights, it must find that one of the grounds for termination have been established by clear and convincing evidence and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(1)-(2) (2003). "Clear and convincing evidence" is defined as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Valentine*, 79 S.W.3d at 546 (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). In the instant action, the trial court found that termination of Mother's parental rights with respect to Child was proper on the grounds of (1) the conditions which led to Child's removal, or other conditions which would in all reasonable probability cause Child to be subjected to further abuse or neglect, still persist and (2) substantial noncompliance with the permanency plan. Because only one ground is required to support the termination of parental rights, Mother must demonstrate that DCS failed to carry its burden of proving either one of these grounds. *Id.* (citing *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000)). Additionally, pursuant to Tenn. Code Ann. § 36-1-113(c)(2) (2003), the trial court determined that termination of Mother's parental rights was in Child's best interest. We begin by reviewing whether the trial court erred when it found that grounds for termination exist.

## Persistent Conditions

Mother argues that the trial court erred when it determined the ground of persistent conditions was established by clear and convincing evidence. The Tennessee Code provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:
>
> . . . .
>
> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A) (2003).

It is undisputed that Child had been removed from Mother by a court order for more than six months. In this case, Stepfather's actions and the environmental neglect by Mother and Stepfather were the conditions resulting in Child's removal. The trial court determined that the current circumstances of Mother and Stepfather–that Mother failed to accept responsibility for her role in Child's abuse, Mother failed to understand or educate herself about Child's needs, and Mother and Stepfather failed to appreciate the effects of domestic violence between themselves on Child–establish the ground of persistent conditions. Additionally, the trial court appears to give weight to the fact that Mother married Stepfather and continued her relationship with him. Specifically, in its ruling, the court stated:

> [A]fter the child was removed in July of '02, [Stepfather] was charged and [Mother] proceeded to continue to have a relationship with [Stepfather], continued to state that the problems were with the child and not [Stepfather's] doings, the Court finds she married [Stepfather] soon thereafter the filing of criminal charges for child abuse.

The trial court's ruling is predicated upon a finding that Stepfather abused Child. After our review of the record as a whole, we cannot say that the evidence preponderates against this finding. Deputy Pinson stated that Child had a red mark on his face which appeared to be a handprint. Additionally, there was testimony that Child told Wilson, a neighbor, and Deputy Pinson that Stepfather slapped Child in the face. Though there is testimony flatly denying Stepfather hit Child, we cannot say that the evidence preponderates against a finding that abuse occurred.

> We are also mindful of the special position a trial court judge holds:
>
> Where the trial judge has seen and heard the witnesses, especially if issues of credibility and weight to be given oral testimony are involved, considerable deference must be accorded those circumstances on review, because it is the trial court which had the opportunity to observe the witnesses' demeanor and to hear the in-court testimony.

*Moore v. Shoney's, Inc.*, No. M2002-02635-WC-R3-CV, 2003 Tenn. LEXIS 1123, at *2-3 (Tenn. Nov. 20, 2003) (citing *Long v. Tri-Con Indus., Ltd.*, 996 S.W.2d 173, 178 (Tenn. 1999)).

In this case, though there was evidence supporting the findings that Mother and Stepfather had created a safe physical environment, there was clear and convincing evidence that Mother and

Stepfather did not accept responsibility for the physical abuse inflicted upon Child, that Mother failed to appreciate Child's special needs, and that Mother and Stepfather were violent to each other and failed to understand the detrimental effect such violence would have on Child. The evidence presented showed that Mother and Stepfather blamed Child for Child's, J.S.'s, and T.B.'s removal by telling falsehoods to Wilson and Deputy Pinson. Later, at trial, Mother stated that she no longer blamed Child but instead blamed DCS and its employees for her current situation. At no point did Mother or Stepfather accept responsibility for Child's abuse.

Further, while there was evidence that Mother was taught certain parenting skills by Andrea Chase, a counselor with the Carey Counseling Center, and that Mother attempted to use some of those skills, there was no evidence that Mother understood and appreciated the needs of Child, who was diagnosed with ADHD and bipolar disorder. Two different county case managers for DCS, Raymond Jenkins and Elane Hart, were both of the opinion that Mother and Stepfather were unable to parent Child. Hart also testified that Mother and Stepfather do not understand Child's mental and emotional needs, though both Mother and Stepfather have been provided parenting and mental health counseling.

Finally, there was evidence that Stepfather continued to abuse Mother and that neither one appreciated the detrimental effects this environment would have on Child. Mother testified that she knew Stepfather had been convicted of domestic violence in the State of Florida prior to their marriage on August 3, 2003, and that Stepfather has hit her but "it's not his fault" because sometimes she "needed it." After reviewing the record as a whole, we cannot say the trial court erred when it found that conditions which led to the child's removal, or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect, still persist.

Further, the evidence supports the trial court's finding that there is little likelihood that such conditions will be remedied at an early date. From the record, it appears that Mother has had a history of abusive relationships with companions, and such abuse is a situation she has come to accept and condone. Stepfather also has a history of being an abusive partner in relationships, as evidenced by his conviction for domestic violence in the State of Florida. Neither Mother nor Stepfather appears to understand the detrimental effects marital abuse has on a child. Additionally, it does not appear that Mother and Stepfather will accept responsibility for their role in Child's abuse at any point since they first blamed Child and, at trial, blamed DCS employees for Child's removal. Finally, even though Mother and Stepfather received various services from DCS to educate themselves about Child's needs, there is little evidence that they understand the needs of an emotionally disturbed child with ADHD and bipolar disorder who acts out sexually against other children. After reviewing the record, we agree with the trial court that there is little likelihood that such conditions will be remedied at an early date.

Finally, we agree with the trial court's finding that the continuation of the relationship between Mother and Child greatly diminishes Child's chances of early integration into a safe, stable and permanent home. Francine Hooten ("Hooten"), Child's special education teacher, David Whitlow ("Whitlow"), a case manager for the Carey Counseling Center, and Andrea Chase

("Chase"), another counselor at the Carey Counseling Center, stated that it is important that Child have structure, consistency, and stability in his life. After working with Child, Chase stated that if Child did not receive such stabilizing elements, he would become disruptive, continue to have problems at home and in school, and be unhappy. Though there was evidence that Child was still experiencing problems while in foster care, Francine Hooten stated that Child is progressing in school and consistently finishing his homework. Additionally, Jo Curtis, Child's current foster mother, testified that Child's behavior is progressing, but Child became disruptive and depressed after his visits with Mother. After reviewing the record as a whole, we agree with the trial court that the continuation of the relationship between Mother and Child greatly diminishes Child's chances of early integration into a safe, stable and permanent home. Because only one ground is required for termination of parental rights, the issue of whether the ground of substantial noncompliance exists as a ground for termination is pretermitted. We must address whether termination of Mother's parental rights is in Child's best interest.

## Best Interest of the Child

Finally, before a trial court may terminate a person's parental rights, in addition to finding a ground for termination by clear and convincing evidence, it must also find that such termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c) (2003). Tennessee Code Annotated § 36-1-113(i) provides:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2003).

After a hearing, the trial court found that termination of Mother's parental rights was in the best interest of Child. We agree. Child was removed from Mother's home in July 2002. During this time, Mother and Stepfather have participated in some programs offered by DCS. However, neither Mother nor Stepfather accept any responsibility for Child's abuse. In addition, each continues to accept abuse and violence between themselves as something that is "needed" in their relationship. Child refers to Mother as "Jennifer," and Curtis, Child's current foster Mother, testified that Child has not expressed any interest in returning to Mother. While in foster care, Curtis stated that Child is progressing though he is still experiencing many problems, presumably because he has been diagnosed with ADHD and bipolar disorder. Under these circumstances, we cannot say the trial court erred when it determined that termination of Mother's parental rights is in Child's best interest.

## Conclusion

For the reasons stated above, we affirm the decision of the lower court. Costs of this appeal are taxed to Appellant, Jennifer S. Blackwell, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE